# AFFIDAVIT IN SUPPORT OF
# APPLICATION FOR CRIMINAL COMPLAINT

I, Justin K. Newsome, being first duly sworn, hereby depose make this affidavit in support of a criminal complaint and arrest warrant and state as follows:

## INTRODUCTION

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI), United States Department of Justice, and I have served in that capacity since November 2003, where I am currently assigned to the Columbia Field Division, Greenville, South Carolina Resident Office. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of section of Title 18 U.S.C. § 2510 (7) and of Title 21 U.S.C. § 878 and am empowered by law to conduct investigations and to make arrest for offenses enumerated in Section of Title 18 U.S.C. § 2516 and Title 21 of the United States Code. I have served as the investigating case agent in numerous investigations of federal violations including murder, sexual assault, bank robbery and other violent crime, drug distribution and firearm violations and various fraud offenses. I have gained knowledge and experience in the use of normal investigative techniques including physical surveillance, execution of search and arrest warrants, use of undercover agents, development and use of confidential informants and cooperating witnesses, and investigative interviews. I also have received training and have experience in the proper identification, preservation, and collection of digital devices and storage media and the analysis of social media applications as an investigatory tool.

2.     This affidavit is submitted in support of a criminal complaint charging LAWRENCE JOSEPH FLORENTINE with Interstate Domestic Violence Resulting in Death, in violation of 18 U.S.C. §§ 2261(a)(2), (b)(1); and Use of Firearm to Cause Death During a Crime of Violence, to wit, Interstate Domestic Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 924(j).

3.      The facts in this affidavit come from my training and experience, my personal observations and analysis of evidence gathered during this investigation, open source information, information obtained from witnesses and local, state, and federal investigators and other government personnel. This affidavit is intended to merely show sufficient probable cause for the requested criminal complaint and arrest warrant and is not an exhaustive compilation of the facts nor does it set forth all my knowledge about this matter.

## RELEVANT STATUTES

4.1     Title 18 U.S.C. § 2261(a)(2) makes it unlawful to cause a spouse, intimate partner, or dating partner to travel in interstate or foreign commerce by force, coercion, duress, or fraud, and who, in the course of, as a result of, or to facilitate such conduct or travel, commits or attempts to commit a crime of violence against that spouse, intimate partner, or dating partner. A conviction for interstate domestic violence resulting in death requires proof of the following essential elements beyond a reasonable doubt:

(1) the defendant and the victim are spouses or intimate partners; (2) the defendant caused the victim to cross a state line by force, coercion, duress, or fraud; (3) in the course of, or as a result of that conduct, the defendant committed a crime of violence upon the victim; and (4) as a result of this crime of violence, the victim died.[1]

4.2     Title 18, United States Code, Section 924(c)(1)(A) makes it a federal crime to knowingly use or carry a firearm during and in relation to a crime of violence for which the person may be prosecuted in a court of the United States and includes increased penalties when the firearm is

---

[1] Coercion or duress exists when an individual is subject to actual or threatened force of such a nature as to induce a well-founded fear of impending death or serious bodily harm from which there is no reasonable opportunity to escape. *United States v. Helem*, 186 F.3d 449, 453 (4th Cir.1999). Also, the phrase "that conduct" refers not simply to interstate travel, but to interstate travel induced by force, coercion, duress, or fraud. See *United States v. Page*, 167 F.3d 325, 329 (6th Cir.1999) (attack inflicted prior to travel occurred "in the course of" causing victim to cross state lines by force, coercion, or duress-- attack and the interstate travel were part of a single course of conduct). Physical violence that precedes an interstate crossing satisfies the "in the course of or as a result of that conduct" language in the statute. *Helem*, 186 F.3d 449, 454. A person may also be convicted of interstate domestic violence under a second theory of liability, where he forces a spouse, intimate partner, or dating partner to travel across state lines under the threat of violence, intentionally preventing her from obtaining medical treatment, thereby exacerbating her injuries. *Id.* at 455.

discharged. Section 924(j) provides for additional increased penalties when, in the course of a violation of section 924(c)(1)(A)(i), the perpetrator causes the death of another person.

A conviction under 18 U.S.C. §§ 924(c)(1)(A)(i) and (j), requires proof of the following essential elements beyond a reasonable doubt:

> (1) the defendant knowingly used or carried a firearm; (2) the use or carrying of a firearm occurred during and in relation to a crime of violence prosecutable in a court of the United States; (3) the use or carrying of the firearm caused the death of the victim.

## PROBABLE CAUSE

5.     On September 6, 2018, LAWRENCE JOSEPH FLORENTINE ("FLORENTINE"), age 51, and N.Z.F., age 34, were married. The couple most recently lived at a residence on Glasscock Road in Rock Hill, South Carolina, and have no children together. At all relevant times, FLORENTINE and N.Z.F. were intimate partners and/or spouses. Prior to and during the marriage, law enforcement documented domestic violence incidents at the couple's home and elsewhere.

- On December 2, 2019, N.Z.F. called 911 and reported to the responding officer that when she arrived at her paternal grandmother's townhouse where she was staying for a few days, the front door was wide open and FLORENTINE was sitting in his white F-250 truck a short distance away.[2] N.Z.F. borrowed a phone from a passer-by to call 911 and when the Rock Hill police officer arrived, she showed the officer her ransacked bedroom. N.Z.F. reported that FLORENTINE had also taken her two dogs and a second cell phone from the bedroom. N.Z.F. stated that in the days leading to her 911 call, she and FLORENTINE were arguing at their Glasscock Road residence when FLORENTINE choked her by putting his hands around her neck. N.Z.F. told officers that although his choking did not restrict her airways and she did not lose consciousness, at the time she thought, "this guy is going to kill you." N.Z.F. stated that when she tried to leave the house, FLORENTINE took her cell phone away and started banging on her car. FLORENTINE was charged with third degree domestic violence and was arrested.[3] According to court records, on December

---

[2] Statements to the responding officer by N.Z.F. were captured and recorded by law enforcement cameras.

[3] On December 7, 2019, during the execution of the arrest warrant, officers seized approximately 26 grams of methamphetamine from the Glasscock Road residence. In addition to third degree domestic violence, FLORENTINE was charged with trafficking methamphetamine. According to court records, the trafficking charge is pending in York County.

A person commits third degree criminal domestic violence if (1) he causes physical harm or injury to a person's own household member; or (2) he offers or attempts to cause physical harm or injury

3

8, 2020, FLORENTINE posted a secured $5,000.00 bond and was released from jail. As a condition of his release, the court imposed a No Contact Order prohibiting FLORENTINE from contacting N.Z.F.

- On December 10, 2019, despite the No Contact Order, FLORENTINE showed up to the residence at Glasscock Road. N.Z.F. called 911 and reported that FLORENTINE told her he was "going to kill her and burn her things" and that he had begun to burn her possessions with a blow torch in the fire pit. When law enforcement arrived, FLORENTINE told officers he was only there for a couple of minutes to pick up some of his clothes. Officers observed a smoldering fire in a pit on the property which FLORENTINE claimed he ignited to burn trash only. Officers allowed FLORENTINE to gather some clothes and escorted him off the property.

- In the evening of December 10, 2019, after receiving a call from N.Z.F.'s father, law enforcement returned to the residence to conduct a well-being check and found FLORENTINE inside the residence. N.Z.F. reported that FLORENTINE came back after officers escorted him off the property. N.Z.F. stated that because FLORENTINE was calm at that point and sleeping in a different room, she would rather avoid a confrontation by allowing him to stay the night than make FLORENTINE angry by having the officers force him to leave the property again.

- On December 11, 2019, officers responded to a 911 call from N.Z.F. at a church located at Old Friendship Road and Glasscock Road.[4] N.Z.F. told police that she and FLORENTINE had gotten into an argument and that FLORENTINE "strangled her with both his hands to the point where she could not breathe"… and that he "punched her with a closed fist multiple times on the side of her head." N.Z.F. also reported that FLORENTINE threatened to "kill her and her dogs". The responding officer observed red marks around N.Z.F.'s neck consistent with strangulation. Officers did not find FLORENTINE at the Glasscock Road residence; however, his white F-250 truck was seen speeding excessively and recklessly away from the residence. Police attempts to stop FLORENTINE's truck, and a subsequent canine and aerial search were all unsuccessful. On December 12, 2019, FLORENTINE was found in the back of the Glasscock Road residence and arrested for second degree criminal domestic violence.[5]

---

to a person's own household member with apparent present ability under circumstances reasonably creating fear of imminent peril. S.C. Code §§ 16-25-20(A), (D) (2015).

[4] Body worn cameras captured and recorded N.Z.F.'s statements to law enforcement.

[5] A person commits second degree criminal domestic violence if (1) he causes physical harm or injury to a person's own household member; or (2) he offers or attempts to cause physical harm or injury to a person's own household member with apparent present ability under circumstances reasonably creating fear of imminent peril under S.C. Code § 16-25-20(A) and "in the process of committing domestic violence in the third degree... (d) the offense is committed by impeding the victim's breathing or air flow; or (e) the offense is committed using physical force or the threatened use of force against another to block that person's access to any cell phone, telephone, or electronic

4

6.  On January 30, 2020, a victim's advocate notified N.Z.F. that FLORENTINE's bond hearing was scheduled and told her the prosecutor intended to request that no bond be set or, in the alternative, request a significant secured bond. N.Z.F. asked that the prosecutor refrain from making any statement at the hearing that would indicate she [N.Z.F.] was afraid of FLORENTINE and/or didn't want him to come home. According to the victim's advocate, N.Z.F. stated she "did not want to tick FLORENTINE off" . . . and that she hoped FLORENTINE would go to live with his brother in Florida if he were released on bond. On February 5, 2020, FLORENTINE was released from jail on a $7,500.00 bond. On April 6, 2020, the criminal domestic violence charges were dismissed, at least in part, at N.Z.F.'s request.[6]

- On May 23, 2020, the couple's Glasscock Road residence was destroyed by fire. Based on the suspicious nature of the fire, investigators with the YCSO and the York County Fire Marshal initiated an arson investigation. Arson investigators scheduled a June 8, 2020, interview with N.Z.F. regarding the fire. During the call, FLORENTINE admitted that a day or so before the house burned, he intentionally "burned N.Z.F.'s clothes and other stuff" in a detached garage. N.Z.F. stated that FLORENTINE started the initial fire in the garage because "he was upset" which FLORENTINE did not dispute. However, FLORENTINE denied that he intentionally set the house on fire. Prior to N.Z.F.'s

---

communication device with the purpose of preventing, obstructing, or interfering with (i) the report of any criminal offense, bodily injury, or property damage to a law enforcement agency; or (ii) a request for an ambulance or emergency medical assistance to any law enforcement agency or emergency medical provider, the offense is committed during the commission of a robbery, burglary or theft..." S.C. Code § 16-25-20(C)(4).

[6] N.Z.F.'s maternal grandmother, Beverly Flavell ("Flavell"), stated that in exchange for concessions from FLORENTINE, N.Z.F. executed a request to dismiss charges to the Sixteenth Circuit Solicitor on April 2, 2020, which in relevant part, reads:

   I, N.Z.F., was a victim of a crime for which an arrest warrant was executed against Lawrence Joseph Florentine on or about [December 6, 2019, and December 12, 2019] on the charge(s) of domestic violence . . . I . . . understand my rights as a victim. It is my desire that this charge NOT be prosecuted, and I hereby request that the prosecutor dismiss this charge against the above-named Defendant.

scheduled interview, FLORENTINE initiated no contact with law enforcement regarding the cause of the fire.[7]

7. On May 23, 2020, FLORENTINE sent several text messages and photographs regarding the fire to N.Z.F. In turn, N.Z.F. forwarded the following screenshots of messages she received from FLORENTINE to Flavell. Flavell provided these messages to law enforcement and based on my review of the messages (*Figures 1-3*), FLORENTINE did not indicate the fire was caused by accident. Instead FLORENTINE's messages to N.Z.F. indicate he deliberately set the fire as an act of revenge for N.Z.F.'s alleged infidelity.



*Figure 1*                *Figure 2*

---

[7] FLORENTINE was not physically injured by the fire. For reasons not known to your Affiant, FLORENTINE checked into the Veteran's Affairs ("VA") Medical Center in Asheville, North Carolina on May 28, 2020, and was discharged June 3, 2020.

6



*Figure 3*                                      *Figure 4*

In a later text message to N.Z.F., FLORENTINE promised N.Z.F. that he would "replace everything" if she would talk to him. When Flavell received the messages, she urged N.Z.F. to call

7

the police. (*Figure 4*). N.Z.F. refused to report the fire herself and asked that Flavell not do so, stating that FLORENTINE would "kill me" [her] if Flavell called the Sheriff's office. FLORENTINE is charged with second degree arson for the Glasscock Road fire.

### CONTACT WITH N.Z.F. FROM JUNE 2, 2020 TO JUNE 9, 2020

8. As of March 31, 2020, N.Z.F. was living with Flavell and her grandfather in Williamston, South Carolina. N.Z.F.'s family members last saw her alive on June 2, 2020, before she left Flavell's residence to meet FLORENTINE in Asheville.[8] Flavell stated that N.Z.F. was driving a rented vehicle—a blue Nissan Rogue when she left for Asheville. According to Flavell, it was normal for N.Z.F., using a cell phone assigned call number xxx-xxx-7853 ("N.Z.F.'s phone"), to communicate with her frequently, sometimes multiple times a day, via text messages and phone calls. Flavell provided your Affiant with text messages she exchanged with N.Z.F. after she left for Asheville. Flavell stated that she is aware of domestic violence incidents between N.Z.F. and FLORENTINE, some of which were reported to law enforcement. Flavell and other family members were concerned for N.Z.F.'s safety when she was with FLORENTINE. Flavell stated that based on her personal observations, FLORENTINE attempted to and did exert physical and emotional control over N.Z.F. Flavell recalled instances in which FLORENTINE monitored N.Z.F.'s phone conversations with her and with other family members.

---

[8] In October 2017, N.Z.F. was released from the Bureau of Prisons to federal supervised release for a 2014 conviction for possession of a firearm by a felon and possession of counterfeit currency. In September 2019, N.Z.F. tested positive for the use of methamphetamine. Based on her drug use and an arrest for committing new criminal conduct—receipt of stolen goods and operating a chop shop—the court initiated supervised release revocation proceedings. While she was awaiting a revocation hearing, N.Z.F. was released from custody on the condition that she live with Flavell, who agreed to serve as the third-party custodian.

9. At approximately 6:11 p.m. on June 7, 2020, surveillance cameras at the entrance of Cube Smart, a Piedmont, South Carolina commercial storage unit captured N.Z.F. and FLORENTINE in the blue Nissan Rogue. The last known phone conversations N.Z.F. had, using her phone, occurred on June 8, 2020, while she was in FLORENTINE's presence. I have also reviewed the recording of the June 8, 2020, phone interview between N.Z.F. and FLORENTINE, and a York County arson investigator. John Egan, N.Z.F.'s federal probation officer, documented his phone conversation with N.Z.F. on June 8, 2020.

10. On June 9, 2020, Flavell exchanged the following text messages with N.Z.F.'s phone:

| | | |
|---|---|---|
| Flavell: | *"RU OK"* [11:24 a.m.] |
| N.Z.F.'s phone: | *"Yes...Miss u"* [5:28 p.m.] |
| Flavell: | *"Love you"* [9:09 p.m.] |
| N.Z.F.'s phone: | *"Love you"* [10:07 p.m.] |

Flavell had no contact with N.Z.F. after 10:07 p.m. on June 9, 2020. On June 10, 2020, at 11:27 a.m., Flavell messaged N.Z.F., and stated "you need to call me before 3:00." Flavell continued to try to reach N.Z.F. by phone and text message including the following messages which read in part as follows:

9



*Figure 5*    *Figure 6*

The phone records show no evidence N.Z.F. continued her normal pattern of life after June 9, 2020. On June 15, 2020, Flavell began to receive message delivery reports (*Figure 5*) which let her know that her June 10-13, 2020, text messages to N.Z.F.'s phone were not delivered and thus, deleted. Based on open-source information, I know that, depending on the service provider, when you send a text message, the system tries to deliver the message for two to five days. So, if the recipient's phone is powered off or out of signal for a long period of time, the networks validity of the message expires, and the system will no longer attempt to deliver the message. When her calls and texts messages were not answered, Flavell filed a missing person report in York County.

## CELL PHONE DATA ANALYSIS

11. Cellular phones use radio frequencies to communicate. When a cell phone is "on," the cellular phone constantly scans its environment, evaluating and ranking which towers have the strongest signal. When a cellular phone places or receives a call, it will utilize the cellular tower and sector with the strongest signal. The tower with the strongest signal generally comes from the tower that is closest to the phone, or in its direct line of sight. Cell towers (sometimes referred to as cell sites) come in a variety of shapes and sizes. They also can be in a variety of places, including but not limited to church steeples, chimneys, water towers, or the sides of buildings. A typical cell tower has three 120-degree sectors, which are labeled numerically.

12. Based on a review of available cell phone records and witness interviews, I believe both N.Z.F. and FLORENTINE carried and regularly used cell phones to make calls, send and receive electronic messages, conduct internet searches, and access social media accounts. I also believe that N.Z.F. and FLORENTINE each carried their respective cell phones on their persons or within proximity at the time of N.Z.F.'s disappearance and death. Thus far, no cell phones or any other electronic device has been recovered.

13. Pursuant to a court-authorized search warrant that required cellular and electronic communications services providers, Verizon Wireless and Google, to provide location and other data for devices linked to accounts known to be used by N.Z.F. and FLORENTINE.[9] Your Affiant

---

[9] Cell phone companies, like Verizon Wireless, maintain databases that capture and store information related to the usage of each customer's cellular phone. These databases generate call detail records ("CDRs"), also sometimes referred to as toll records. The CDRs document the network interactions to and from the cell phone, to include the date, time, duration, number called, and calling number. Additionally, the CDRs capture the cell tower and cell sector ("cell site") which served the cell phone when contact was initiated with the network. An analysis was performed on the CDRs obtained for the subject cell phones in this case. Used in conjunction, the call detail records, and a list of cell site locations illustrate an approximate location of the subject cell phone when it initiated contact with the network.

and the FBI Cellular Analysis Survey Team ("CAST") reviewed CDRs and location data for: 1) N.Z.F.'s phone from June 3, 2020 through June 9, 2020; and 2) a Google account linked to N.Z.F.'s phone from June 3, 2020 through June 7, 2020; and 3) a Google account linked to call number xxx-xxx-7892 ("FLORENTINE's phone") phone from June 3, 2020 through June 9, 2020.

14.     According to cell site data, on June 3, 2020, beginning at approximately 4:09 a.m., N.Z.F.'s phone connected to a cell tower located in close proximity to the VA Medical Center in Asheville. N.Z.F.'s phone connected to multiple cell towers in the vicinity of the hospital through the early morning hours of June 3, 2020. Location data for N.Z.F.'s phone is consistent with her traveling from Williamston to Asheville while FLORENTINE was admitted to and after he was discharged from the VA hospital in Asheville on June 3, 2020. Later in the morning of June 3, 2020, N.Z.F.'s phone began connecting to cell towers along Interstate 40 traveling eastward in North Carolina. N.Z.F.'s phone connected to various cellular towers in and around the Marion, North Carolina area. N.Z.F.'s phone last connected to a cellular tower on June 3, 2020, at approximately 7:53 p.m. while in the Swannanoa, North Carolina area. The location data for the Google accounts linked to N.Z.F.'s phone and to FLORENTINE's phone show N.Z.F. and FLORENTINE were in the same locations on June 3, 2020.

---

Google collects and stores user location data. The company uses this information for location-based advertising and location-based search results. Per Google, this information is derived from GPS data, cell site/cell tower information, and Wi-Fi access points. While the specific parameters of when this data is collected are not entirely clear, it appears that GOOGLE collects this data whenever one of their services is activated and/or whenever there is an event on the mobile device such as a phone call, text messages, internet access, or e-mail access. This data shows the movements of the individual's mobile device and assist investigators with establishing patterns of movement and identify areas that may constitute and/or contain evidence relevant to criminal investigations.

15.     On June 4, 2020, consistent with financial records which show charges to a debit card for a hotel room rental at the Quality Inn in Black Mountain, North Carolina from June 3, 2020 to June 5, 2020, N.Z.F.'s phone connected to cellular towers in Asheville and Black Mountain, North Carolina. The location data for the Google accounts linked to N.Z.F.'s phone and to FLORENTINE's phone indicates that N.Z.F. and FLORENTINE were traveling together in North Carolina during this time. Location data for June 5, 2020, through June 6, 2020, show N.Z.F.'s phone connected to various cellular towers in and around Asheville, Black Mountain, Swannanoa and in Laurens County, South Carolina. The location data for the Google account linked to N.Z.F.'s phone and a Google account linked to FLORENTINE's phone is consistent with N.Z.F. and FLORENTINE being at the same location at the same time from June 5, 2020, through June 6, 2020.

16.     According to the data, on June 7, 2020, N.Z.F.'s phone connected to various cellular towers in southern Greenville County. Connections to a cellular tower in the vicinity of a Cube Smart rental storage facility on Fork Shoals Road is consistent with the surveillance footage which, as stated above, captured N.Z.F. and FLORENTINE together at the storage facility on June 7, 2020. Also on June 7, 2020, N.Z.F.'s phone connected to a cellular tower located approximately seven tenths of a mile south of the Super Inn, a motel, located at 7143 Augusta Road in Piedmont, South Carolina. The vast majority of her phone connections hit the sector of the tower in the direction of the motel. The phone continued to connect to this same tower through the evening of June 7, 2020, until the next morning.

17.     Cell site data for June 8, 2020, shows N.Z.F.'s phone connected to multiple towers along Interstate 85 to Blacksburg, South Carolina and then Highway 5 to Rock Hill while traveling from the vicinity of the Super Inn to the Glasscock Road residence in Rock Hill. Based on cell site data,

on June 9, 2020, at approximately 7:28 a.m., N.Z.F.'s phone connected to a cellular tower in York County.

18. About an hour and a half later, at approximately 9:03 a.m. on June 9, 2020, location data shows that N.Z.F.'s phone connected to the same cellular tower located less than a mile from the Super Inn in Piedmont and did so for the rest of the day up to 8:59 p.m. CDRs for N.Z.F.'s phone shows relatively normal phone activity for N.Z.F.'s phone in the days leading up to June 9, 2020. No text messages or outgoing calls were made from N.Z.F.'s phone after June 9, 2020, which indicates that either her phone ran out of battery, was intentionally turned off, was put in airplane mode, was out of signal range or otherwise disabled after the 10:07 p.m. outgoing text. So while Flavell continued to call and send text messages to N.Z.F.'s phone, the phone records show no incoming or outgoing activity for N.Z.F.'s phone after 10:07 p.m.

19. Location data for the Google account linked to FLORENTINE's phone was last recorded at 11:51 p.m. All of the available Google location data for FLORENTINE's phone shows its location at or near the Super Inn during the evening hours of the June 9, 2020, at the same time N.Z.F.'s phone registers at that location.

20. I believe FLORENTINE purposely powered off or otherwise disabled N.Z.F.'s phone and his own phone on the night of June 9, 2020, to avoid detection. In a text message to N.Z.F. on May 23, 2020, FLORENTINE indicated he was aware of a cell phone's location feature and knew how to disable his phone's location services to help conceal the device and the device holder's location. As no cell phones have been recovered, I believe that FLORENTINE has hidden or discarded and destroyed his phone and N.Z.F.'s phone to prevent the phones from being recovered and examined for evidence by law enforcement.

## DISCOVERY OF N.Z.F.'S BODY IN FREDONIA, KENTUCKY

21. On June 13, 2020, agents with the Kentucky State Police ("KSP") and officers with the Caldwell County Sheriff's Office responded to a call from a groundskeeper at Hill Cemetery in Fredonia, Kentucky. The call concerned the discovery of what the groundskeeper believed to be a partially clothed, dead body, later identified as N.Z.F., buried in a shallow grave covered with branches and other debris. After N.Z.F.'s body was recovered, an autopsy was conducted. According to the autopsy report, the manner of death is homicide, and the cause of death was a .22 caliber bullet wound to the head.

22. A small gas can on which both N.Z.F's and FLORENTINE's DNA were found, was recovered by police from behind a tree near the gravesite. A local hardware store clerk identified purchase transactions that occurred at approximately 12:30 p.m. on June 11, 2020, by a customer who matched FLORENTINE's description. According to the store's sales records, the customer paid cash for a shovel and a gas can identical to the can found at the cemetery. Surveillance video camera footage from a nearby gas station shows FLORENTINE filling the gas can a short time later. Parts of N.Z.F.'s body and fabric material found in the grave were burned by fire.

23. After the discovery of N.Z.F.'s body, witness interviews, a review of cell phone data, recorded retail transactions and surveillance video footage in the vicinity of the Hill Cemetery, the KSP obtained warrants charging FLORENTINE with murder-domestic violence and abuse of a corpse. On August 10, 2020, a grand jury in Kentucky returned an indictment charging FLORENTINE with abuse of a corpse and murder-domestic violence.

24. Based on the investigation, I believe that on or about June 9, 2020, in the course of traveling across state lines from South Carolina, FLORENTINE shot N.Z.F., causing her death. I am not aware of any request to render assistance, medical or otherwise, to N.Z.F. during this time.

FLORENTINE arrived in Fredonia, Kentucky, which is approximately a 7 ½ hour drive from the Super Inn in Piedmont. Once he arrived in Fredonia on June 11, 2020, FLORENTINE purchased supplies and buried N.Z.F.'s body in Hill Cemetery. On or about June 11, 2020, FLORENTINE fled the Kentucky gravesite and arrived in Denver, Colorado on or around June 22, 2020.[10] FLORENTINE ultimately turned himself in to the Denver Police on June 23, 2020.

## CONCLUSION

25.     Based on the foregoing, there is probable cause to believe that LAWRENCE JOSEPH FLORENTINE, in this district and elsewhere, did violate 18 U.S.C. §§ 2261(a)(2), (b)(1) (Interstate Domestic Violence Resulting in Death) and 18 U.S.C. §§ 924(c)(1)(A)(i) and 924(j) (Use of Firearm to Cause Death During a Crime of Violence).

26.     This affidavit has been reviewed by AUSA Leesa Washington.

Respectfully submitted,

Special Agent Justin K. Newsome
Federal Bureau of Investigation

Subscribed and sworn to before me on October 14, 2022.

Jacquelyn D. Austin
United States Magistrate Judge

---

[10] On June 22, 2020, police located the abandoned 2020 blue Nissan Rogue, in Colorado Springs, Colorado. Officers recovered three (3) .22 caliber cartridges from the center console of the vehicle. No firearm was recovered from the vehicle nor from FLORENTINE. After DNA testing, blood found on the rear bumper near the trunk of the vehicle was determined to be N.Z.F.'s blood. According to Enterprise Car Rental records, N.Z.F. rented the vehicle in Rock Hill on May 20, 2020.

16